PER CURIAM.
 

 Donald Banks appeals his conviction of first-degree murder and sentence of death.
 
 [1]
 
 For the reasons stated below, we affirm his conviction and sentence.
 

 I. BACKGROUND
 

 As the trial court accurately explained in its sentencing order, the evidence presented at trial established the following regarding the murder of Linda Volum:
 

 During the late evening hours of March 9 or the early morning hours of March 10, 2005, the Victim was stabbed to death. The killing probably occurred between midnight and 4:00 a.m. on March 10, 2005. The Victim received fourteen knife wounds, one to the neck, ten to the chest or abdomen, and three to her left forearm and hand. She also received abrasions and contusions in different areas of her body, especially around the hands and to the top of the head. She further received several small cuts in different areas, including the back of the hand and around the left eye. At least six of the wounds were hard stabs from a knife, rather than simple jabs, in that they penetrated the Victim’s ribs or sternum. One stabbing penetrated her liver, two or three penetrated her heart, and one penetrated her lung. The Victim attempted to defend herself against this attack, and was conscious and aware throughout the attack. She ultimately died from a loss of blood due to the stab wounds to her heart.
 

 
 *993
 
 Between 2:40 and 2:47 a.m. on the same day, then, a person attempted to access an automatic teller machine with the Victim’s ATM card. This event was recorded by a video surveillance camera. Though the face of the person was not revealed in the recording, it was clearly a black male wearing a unique shirt, and jacket, visually identical to the ones [Banks] was wearing that night. ( [Banks] is also a black male). Furthermore, this person was driving a white, compact sedan which matched the description of the Victim’s automobile. The person was accompanied to the ATM location by another, still unidentified person.
 

 Before dawn on the same morning, then, [Banks] returned to a residence he shared with his girlfriend, one Sudi[e] Johnson (“Johnson”). He had been away from the residence all night. He was driving a vehicle which appeared to be identical to that of the Victim. He entered the home limping, from a wound to his leg. He carried with him a pillowcase the same color as another pillowcase found later that day in the Victim’s home.[
 
 2
 
 ] Within the pillowcase, he carried bloody underclothing, and the Victim’s laptop computer.[
 
 3
 
 ] When Johnson asked him about the bloody clothing, [Banks] told her that “I just murked somebody.” The word “murk” is a slang term meaning murder. [Banks] had been bleeding from the wound to his leg, and continued to bleed while he was at the residence. However, about an hour after his arrival, he again departed in the same automobile in which he had arrived.
 

 Later the same morning the Victim’s automobile was involved in a traffic accident. After the accident, the occupants of the vehicle fled from the scene. Deputy sheriffs investigating the accident, though, were able to ascertain that it was owned by the Victim. In the course of investigating the accident, then, a deputy went to the Victim’s residence, where he found her dead body.
 

 About a day and a half after the foregoing events, Johnson took [Banks] to a hospital so that he could receive medical care for his leg wound. The wound subsequently proved to be almost visually identical to one of the wounds the Victim had received during the murder.
 

 Johnson testified at trial that when [Banks] initially told her he had murdered someone, she did not believe him. She thought he was simply seeking attention. However, several days later she and [Banks] were watching a videotaped television program when a news flash was aired regarding the murder of Linda Volum. [Banks] then stated to Johnson “You see that?” and “I did that.” These remarks led Johnson to question [Banks] about the murder. In response, he related to her facts about the crime which could only have been known by someone who was present at the murder, or sheriffs investigators. He also told her that he had committed the crime as a “murder pay-back,” and that he had done so after entering the Victim’s residence in only his underclothing. He further said that when he left the residence “I had set the house up as a prop.” He explained that he had done so by putting a crack pipe in the residence, to make the murder appear to be “foul play.” [Banks] related [to Johnson] that he had received the wound to his leg on the night in question
 
 *994
 
 by accidentally stabbing himself in the course of stabbing the Victim to death.
 

 The sheriffs office investigation of the crime scene produced substantial physical evidence of [Banks’] guilt. Indeed, a crack pipe, along with a knife, was found under the Victim’s body. Blood, which DNA testing proved to be [Banks’], was found in several places in the house. [Banks’ semen] was found on the Victim’s body, and a mixture of blood from both [Banks] and the Victim was found near the body. [Banks’] bare footprint was also found in some blood in the house. In addition, the [prints] of some unknown person [were] found in blood in one place, indicating that another person may have been present at the murder, besides [Banks]. That person has never been identified.
 

 During the guilt phase, Banks maintained his innocence. He testified that he sold crack out of Volum’s residence and that Volum had exchanged sex as well as the use of her laptop and vehicle for crack. Banks stated that during the evening of Volum’s murder he had cut his fingers on a crack pipe, thereby explaining his blood in Volum’s residence. He also testified that Volum had asked him to go to the ATM for her and that an acquaintance, “Bo,” accompanied him on the trip. He stated that when he left that night to go home “Bo” remained at Volum’s residence. However, the jury found Banks guilty of first-degree murder.
 

 The defense, during the penalty phase, presented the testimony of Banks’ father and a forensic psychologist. Banks’ father testified that he had not been a part of his son’s life since his son was seven years old. The psychologist testified that there was no evidence of any major mental illnesses or thought disorders. However, testing suggested mild to moderate deficits in frontal lobe functioning, which is responsible for planning, problem solving, and impulse control. The psychologist diagnosed him with a cognitive disorder not otherwise specified as well as antisocial personality disorder. Moreover, the psychologist noted a history of alcohol and substance abuse.
 

 The jury recommended the death penalty by a vote of ten to two, and a
 
 Spencer
 

 [4]
 

 hearing was held on August 6, 2008. Thereafter, following the jury’s recommendation and concluding that the aggravating circumstances outweighed the mitigating circumstances, the trial court sentenced Banks to death. In so doing, the trial court found the following aggravators: (1) Banks had been previously convicted of violent felonies (very great weight); (2) the crime was especially heinous, atrocious, or cruel (very great weight); and (3) the crime was committed in a cold, calculated, and premeditated manner (great weight). The trial court found the following miti-gators: (1) Banks has a low IQ (very little weight); (2) Banks has a deficit in his brain (moderate weight); (3) Banks has antisocial personality traits (little weight); (4) Banks was not the only participant in the crime (no weight); and (5) Banks had a difficult youth (little weight).
 

 II. ISSUES RAISED ON APPEAL
 

 Banks raises six issues on appeal: (A) the trial court erred in denying a cause challenge to a prospective juror whose daughter had been the victim of an armed robbery; (B) the trial court erred in allowing the State to exercise peremptory challenges against two African-Americans; (C) the trial court erred in admitting DNA results without requiring the presentation of statistical evidence; (D) the trial court erred in denying a motion for mistrial
 
 *995
 
 when a witness mentioned Banks’ involvement in another crime; (E) the trial court erred during the penalty phase by allowing the State to present a video of Banks committing an armed robbery; and (F) the trial court erred in finding the cold, calculated, and premeditated (CCP) aggravating circumstance. None of these claims warrant relief.
 

 A. Cause Challenge
 

 Banks argues that the trial court erred in denying his cause challenge to a prospective juror whose daughter was recently robbed at gunpoint. However, we conclude that no reversible error occurred.
 

 This Court has explained that “[a] trial court has great discretion when deciding whether to grant or deny a challenge for cause based on juror competency.”
 
 Conde v. State,
 
 860 So.2d 930, 939 (Fla.2003). “This is because trial courts have a unique vantage point in their observation of jurors’ voir dire responses.” ■
 
 Id.
 
 As a result, “this Court gives deference to a trial court’s determination of a prospective juror’s qualifications and will not overturn that determination absent manifest error.”
 
 Id.
 
 The test trial courts employ “for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court.”
 
 Kopsho v. State,
 
 959 So.2d 168, 170 (Fla.2007). “In evaluating a juror’s qualifications, the trial judge should evaluate all of the questions and answers posed to or received from the juror.”
 
 Parker v. State,
 
 641 So.2d 369, 373 (Fla.1994). “A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind.”
 
 Kopsho,
 
 959 So.2d at 170;
 
 see also
 
 § 913.03(10), Fla. Stat. (2005) (explaining that one can challenge a juror for cause based upon the juror’s “state of mind regarding the defendant, the case, the person alleged to have been injured by the offense charged, or the person on whose complaint the prosecution instituted that will prevent the juror from acting with impartiality, but the formation of an opinion or impression regarding the guilt or innocence of the defendant shall not be a sufficient ground for challenge to a juror if he or she declares and the court determines that he or she can render an impartial verdict according to the evidence”).
 

 In this case, the juror at issue twice assured the trial court that his daughter’s recent robbery would not affect his ability to be fair. He stated, “It’s not going to bother me” and “It won’t affect me, no, sir.” These unequivocal assurances of impartiality do not provide this Court -with a basis to conclude that the trial court abused its discretion in denying Banks’ cause challenge. In other words, it does not appear that the juror’s unequivocal responses provided any reasonable doubt as to whether the juror possessed an impartial state of mind.
 
 Cf. Kopsho,
 
 959 So.2d at 172 (“Mullinax’s consistently equivocal responses raise reasonable doubt about his fitness as a juror.”);
 
 Segura v. State,
 
 921 So.2d 765, 766 (Fla. 3d DCA 2006) (holding that the trial court abused its discretion in denying cause challenge because, “[d]espite repeated questioning and attempts to rehabilitate the juror, she never expressed a clear assurance that [her niece’s sexual assault] would not influence her judgment”).
 

 Accordingly, we affirm the trial court’s denial of Banks’ cause challenge.
 

 B. Peremptory Challenges
 

 Banks alleges that the trial court reversibly erred when it allowed the State to strike two African-American prospective jurors without providing a legitimate race-neutral reason. We disagree.
 

 
 *996
 
 In
 
 Melbourne v. State,
 
 679 So.2d 759, 764 (Fla.1996) (footnotes omitted), this Court set forth the following guidelines for resolving an allegation of discrimination in the use of peremptory challenges:
 

 A party objecting to the other side’s use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
 

 At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3).
 

 “In determining whether or not a proffered race-neutral reason for a peremptory strike is a pretext, the court should focus on the genuineness of the race-neutral explanation as opposed to its reasonableness.”
 
 Murray v. State,
 
 3 So.3d 1108, 1120 (Fla.2009),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 396, 175 L.Ed.2d 273 (2009). “In making a genuineness determination, the court may consider all relevant circumstances surrounding the strike.”
 
 Id.
 
 “Relevant circumstances may include — but are not limited to — the following: the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment.”
 
 Melbourne,
 
 679 So.2d at 764 n. 8. “[T]he most important consideration is that the trial judge actually ‘believes that given all the circumstances surrounding the strike, the explanation is not a pretext.’ ”
 
 Murray,
 
 3 So.3d at 1120 (quoting
 
 Rodriguez v. State,
 
 753 So.2d 29, 40 (Fla.2000)).
 

 “[Reviewing courts should keep in mind two principles when enforcing the above guidelines. First, peremptories are presumed to be exercised in a nondiscriminatory manner. Second, the trial court’s decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous.”
 
 Melbourne,
 
 679 So.2d at 764-65 (footnote omitted).
 

 In this case, Banks objected to the striking of the two African-American prospective jurors and requested a race-neutral reason, thereby satisfying step one of the
 
 Melbourne
 
 guidelines. Subsequently, the State satisfied step two by providing a facially race-neutral reason for the strikes by explaining that it wished to strike the two gentlemen because they were both single and renters. Banks responded that being single and a renter does not mean that one is unsuitable for jury service. The State countered that it had already struck another single renter who happened to be a white male. After considering the arguments of both parties regarding genuineness, the trial court sustained the strikes as allowed by step three.
 

 The trial court’s determination regarding the genuineness of the State’s race-neutral reason was not clearly erroneous given all the relevant circumstances surrounding the strikes. For example, the State struck the other prospective jurors who were single renters, including one of whom it is clear from the record was a white male. Additionally, the State did not strike at least one African-American male prior to moving to strike the two who were single renters. Moreover, at least
 
 *997
 
 two African-Americans and one Hispanic individual eventually served on the jury.
 

 Therefore, we conclude that the trial court did not commit reversible error in allowing the State to strike the two African-American single renters.
 

 C. DNA Evidence
 

 Next, Banks contends that the trial court erred by allowing the State to present DNA evidence without also requiring the State to present population frequency statistics regarding the significance of that DNA evidence. However, this claim was not preserved for this Court’s review.
 

 Banks did not present this argument to the trial court below. Instead, in his motion in limine, Banks argued that the population statistics failed to satisfy the
 
 Frye
 

 [5]
 

 test, the State’s expert was not qualified as an expert in the field of population frequency statistics, and the population frequency test was improperly conducted. Later, during the expert’s testimony, Banks made a “predicate” objection, contending that the State’s expert was not qualified to discuss population statistics and that the expert must explain how he arrived at his numbers. During a sidebar conversation, the State explained that it did not plan to have its expert testify regarding population frequency statistics and that if it did so it would establish the proper foundation.
 

 Banks never argued below that population frequency statistics must be introduced for DNA results to be admissible. Consequently, this issue is procedurally barred.
 
 See Singleton v. State,
 
 783 So.2d 970, 978 (Fla.2001) (“Because defense counsel did not raise this argument below, it is not cognizable on appeal and is procedurally barred.”).
 

 D. Testimony Regarding Uncharged Crime
 

 Bank asserts that the trial court abused its discretion in denying his motion for mistrial when witness Sudie Johnson implicated him in an uncharged crime. We disagree.
 

 “A ruling on a motion for a mistrial is within the sound discretion of the trial court and should be ‘granted only when it is necessary to ensure that the defendant receives a fair trial.’ ”
 
 Gore v. State,
 
 784 So.2d 418, 427 (Fla.2001) (quoting
 
 Goodwin v. State,
 
 751 So.2d 537, 547 (Fla.1999)). The standard of review applied to a trial court’s ruling on a motion for mistrial is abuse of discretion.
 
 Floyd v. State,
 
 913 So.2d 564, 576 (Fla.2005). Under the abuse of discretion standard of review, a ruling will be upheld unless the ruling is “arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.”
 
 Lugo v. State,
 
 2 So.3d 1, 19 (Fla.2008) (quoting
 
 Parker v. State,
 
 904 So.2d 370, 379 (Fla.2005)).
 

 In this case, Banks’ former girlfriend, Sudie Johnson, testified on cross-examination that she did not believe Banks when he first told her that he had “murked” someone. She thought he was just trying to get more attention from her, and she at first believed that Banks was not capable of such an act. Johnson testified that she was not aware that Banks was having sex with other women. Thereafter, defense counsel asked Johnson whether she changed her mind about Banks and stopped supporting him “because you found out that he and Ms. Volum had sex?” Johnson responded, “No, that wasn’t the reason. The reason was from the previous — I supported Mr. Banks all
 
 *998
 
 the way up until I seen the tape of him stabbing Mr. William Johnson....”
 

 Defense counsel objected and moved for a mistrial, contending that the other victim was irrelevant and Johnson’s response was not an invited comment because he did not ask about other crimes but instead asked about when she changed her, mind about Banks. The trial judge denied the defense’s motion for mistrial. However, the trial judge gave a curative instruction, and the State agreed not to mention it in its closing argument. The next day the trial judge polled the jury to determine if the jurors could follow his instruction to disregard Johnson’s remark regarding the other stabbing. All of the jurors indicated that they would disregard Johnson’s remark and base their verdict only on the evidence lawfully before them.
 

 Therefore, the trial court acted within its sound discretion when denying the motion for mistrial. We affirm the trial court’s denial.
 

 E. Video
 

 Banks next argues that the trial court erred by admitting, during the penalty phase, a soundless surveillance video of Banks committing a robbery and stabbing at a convenience store. We disagree.
 

 As this Court has explained, “it is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction.”
 
 Rhodes v. State,
 
 547 So.2d 1201, 1204 (Fla.1989). “[R]elevant evidence concerning the circumstances of a prior violent felony conviction is admissible in a capital sentencing proceeding, unless admission of the evidence would violate the defendant’s confrontation rights, or the prejudicial effect of the evidence clearly outweighs its probative value.”
 
 Finney v. State,
 
 660 So.2d 674, 683 (Fla.1995). “Testimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence.”
 
 Rhodes,
 
 547 So.2d at 1204;
 
 see also Singleton v. State,
 
 783 So.2d 970, 978 (Fla.2001) (quoting Rhodes);
 
 Elledge v. State,
 
 346 So.2d 998, 1001 (Fla.1977) (“This is so because we believe the purpose for considering aggravating and mitigating circumstances is to engage in a character analysis of the defendant to ascertain whether the ultimate penalty is called for in his or her particular case. Propensity to commit violent crimes surely must be a valid consideration for the jury and the judge.”). “However, the details of the collateral offense must not be emphasized to the point where that offense becomes the feature of the penalty phase.”
 
 Finney,
 
 660 So.2d at 683.
 

 In this case, the trial court did not abuse its discretion in admitting the surveillance video of Banks robbing and stabbing William Johnson on March 23, 2005. The video is undeniably probative of the circumstances of Banks’ prior violent felony. And a review of the video demonstrates that its probative value is not outweighed by its prejudicial effect. The approximately two-minute video is soundless with most of the footage devoted to viewing the victim and others inside a convenience store. The actual crime occurred very quickly, and it is not clear from the video how many times Banks stabbed William Johnson because the camera’s view of the stabbing was obstructed by a vehicle. Moreover, while blood is visible and while Johnson temporarily falls to the ground, Johnson gets back up and walks into the convenience store holding his arm. The jury was never informed that William Johnson eventu
 
 *999
 
 ally died as a result of the wounds he suffered. Therefore, the prejudicial effect of the video is less than the prejudicial effect involved in
 
 Singleton,
 
 where this Court upheld the penalty phase testimony of the victim even though her swearing in and identification of Singleton allowed the jury to view the prosthetics she needed after Singleton chopped off her arms during his prior violent felony.
 
 See Singleton,
 
 783 So.2d at 978.
 

 Additionally, the details of Banks’ prior violent felony did not become the focus. The trial court refused to permit the State to introduce storyboards that had been used in Banks’ trial for the robbery and stabbing. And the detective who authenticated the video did not testify extensively about his investigation. Finally, while the State did discuss the video in relation to the prior violent felony aggravator, it was not the primary focus of the State’s penalty phase closing argument.
 

 Given the above, the trial court did not abuse its discretion in admitting the video during the penalty phase.
 

 F. Cold, Calculated, and Premeditated Aggravator
 

 Banks contends that the cold, calculated, and premeditated (CCP) aggravator was not proven beyond a reasonable doubt. His claim is without merit.
 

 This Court has explained the following regarding the CCP aggravator:
 

 A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances.
 
 See Hudson v. State,
 
 992 So.2d 96, 116 (Fla.2008);
 
 Lynch [v. State,
 
 841 So.2d 362, 372 (Fla.2003) ]. The scope of review is limited “to ensuring that the trial court applied the correct rule of law, and if so, that there is competent, substantial evidence to support its findings” as to an aggravating factor.
 
 Caballero v. State,
 
 851 So.2d 655, 661 (Fla.2003) (citing
 
 Willacy v. State,
 
 696 So.2d 693, 695 (Fla.1997)). For CCP to be found, the killing must be “the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.”
 
 Franklin v. State,
 
 965 So.2d 79, 98 (Fla.2007).
 

 Gill v. State,
 
 14 So.3d 946, 962 (Fla.2009).
 

 Here, there is competent substantial evidence to support the trial court’s finding of the CCP aggravator. According to Sudie Johnson’s testimony, Banks admitted that the murder was a “murder pay-back” and that he took off his outer garments before entering Volum’s residence. Banks also told Johnson that he staged the crime scene to make it look like a drug-related murder. Therefore, the State presented evidence that Banks coolly and carefully planned to murder Volum before he entered her residence with no pretense of moral or legal justification. Accordingly, the trial court did not err in finding the CCP aggravator.
 

 III. SUFFICIENCY OF EVIDENCE
 

 This Court reviews “the record of a death penalty case to determine whether the evidence is sufficient to support the murder conviction.”
 
 Winkles v. State,
 
 894 So.2d 842, 847 (Fla.2005);
 
 see also Davis v. State,
 
 859 So.2d 465, 480 (Fla.2003). Here, there is competent substantial evidence to support Banks’ murder conviction.
 

 As explained previously, Banks confessed to Sudie Johnson that he repeatedly stabbed Volum as a “murder pay-back.”
 
 *1000
 
 Banks also told Johnson that he removed his outer clothes before entering Volum’s residence and that he had accidentally stabbed his leg when he missed Volum’s body during the attack. Consistent with the information Banks relayed to Johnson, the medical examiner testified that Volum had indeed died as a result of multiple stab wounds. Also consistent with the information Banks relayed to Johnson, Banks’ blood, fingerprints, and footprints were found at the crime scene. Additionally, the night of the murder Banks attempted to use Volum’s ATM card, and he was seen driving a car that matched the description of Volum’s white, compact sedan. Moreover, Volum’s laptop was later recovered from the residence that Banks shared with Johnson. Also, Johnson testified that she saw bloody undergarments in a pillow case that Banks used to carry the laptop into their residence the morning after the murder. The pillowcase was the same color as Volum’s sheets, and a pillow at the crime scene was missing its case.
 

 Accordingly, there is sufficient evidence to support the murder conviction.
 

 IV. PROPORTIONALITY
 

 “This Court must review the proportionality of a death sentence, even if the issue has not been raised by the defendant.”
 
 Bolin v. State,
 
 869 So.2d 1196, 1204 (Fla.2004). Proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Crook v. State,
 
 908 So.2d 350, 856 (Fla.2005) (quoting
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998)). Instead, the Court considers the totality of the circumstances to determine if death is warranted in comparison to other cases where the death sentence has been upheld.
 
 Davis v. State,
 
 859 So.2d 465, 480 (Fla.2003). In addition, the heinous, atrocious, or cruel aggravator and the cold, calculated, and premeditated aggravator are “two of the most serious aggravators set out in the statutory sentencing scheme.”
 
 Larkins v. State,
 
 739 So.2d 90, 95 (Fla.1999).
 

 The instant case involves a murder by stabbing. The jury recommended death by a vote of ten to two. The trial court found three aggravating circumstances beyond a reasonable doubt: (1) committed by a person previously convicted of a violent felony (very great weight); (2) especially heinous, atrocious, or cruel (HAC) (very great weight); and (3) committed in a cold, calculated, and premeditated manner (CCP) (great weight). The trial court found five mitigating circumstances: (1) low IQ (very little weight); (2) brain deficit (moderate weight); (3) antisocial personality traits (little weight); (4) not the only participant (no weight); and (4) difficult youth (little weight).
 

 Under the totality of the circumstances, Banks’ sentence is proportional in relation to other death sentences that this Court has upheld.
 
 See, e.g., Merck v. State,
 
 975 So.2d 1054 (Fla.2007) (death sentence proportionate for stabbing murder where trial court found prior violent felony and HAC aggravators, statutory age mitigator, and several nonstatutory mitigators, including: a difficult family background; alcohol use the night of the murder; and a capacity to form positive relationships);
 
 Singleton v. State,
 
 783 So.2d 970 (Fla.2001) (death sentence proportionate for stabbing murder where trial court found prior violent felony and HAC aggravators as well as substantial mitigation, including: extreme mental or emotional disturbance; impaired capacity to appreciate criminality of conduct or to conform conduct to requirements of law; and under influence of alcohol and possibly medication at time of offense);
 
 Blackwood v. State, 111
 
 So.2d 399 (Fla.2000) (death sentence proportionate for strangulation murder where trial court found HAC ag-
 
 *1001
 
 gravator, one statutory mitigator, and eight nonstatutory mitigators).
 

 V. CONCLUSION
 

 For the reasons expressed above, we deny each claim raised on appeal and affirm Banks’ conviction and sentence of death.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const.
 

 [2]
 

 . There was a pillow without a pillowcase at the crime scene.
 

 [3]
 

 . When Johnson accessed the computer, she noticed the name L. Volum on the screen.
 

 [4]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [5]
 

 .
 
 Frye v. United States,
 
 293 F. 1013 (D.C.Cir.1923).