# Supreme Court of Florida

_____

No. SC13-1002
_____

**VICTOR GUZMAN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 6, 2017]

PER CURIAM.

Victor Guzman appeals his conviction of first-degree murder and sentence

of death.  We have jurisdiction.  See art. V, § 3(b)(1), Fla. Const.  For the reasons

explained below, we affirm Guzman's conviction but reverse his sentence of death

and remand this case to the trial court for a new penalty phase.

## I.  BACKGROUND

On December 9, 2000, Severina Fernandez was found stabbed to death in

her Miami apartment.  The case went cold until 2004, when DNA from blood left

at the crime scene was determined to match Victor Guzman's DNA.  As a result,

Guzman was indicted for first-degree murder, stood trial, and was convicted.  The

jury recommended a sentence of death by a vote of seven to five, and the trial court followed the jury's recommendation. This appeal follows.

## A. Guilt Phase

Severina "Lola" Fernandez was an eighty-year-old widow who lived alone in her Miami apartment. She was last seen alive around 3:30 p.m. on December 9, 2000, when she went out to retrieve her newspaper. At approximately 6:15 p.m., a neighbor discovered Fernandez's door was half open and, when Fernandez did not answer, the neighbor entered the apartment where she found Fernandez stabbed to death on her bed. Fernandez's body was nude. Her dress was underneath her, covered in blood with stab holes and a torn zipper. Her panties, which had been pulled down and were dangling off of her right leg, also had stab holes in them. The evidence suggested that Fernandez was killed shortly after she returned from getting the newspaper.

There was blood throughout the apartment, which was swabbed for DNA analysis. A plastic cup, which appeared to be out of place on the recliner in the living room, was also swabbed for DNA analysis.

Initial DNA analysis conducted in 2000 revealed that a single male DNA profile was present on swabs of blood obtained from inside the kitchen sink, the floor of the bedroom to the west of the bed, and the bedroom dresser. That same male DNA profile could not be excluded as a contributor to a mixture of DNA

profiles obtained from the cup found on the recliner.  Specimens from a sexual battery kit done on Fernandez tested negative for the presence of sperm.

In 2003, the case was assigned to Detective Andres Arostegui, a member of the cold case homicide division.  Detective Arostegui testified that he learned of information[1] in 2004 that led him to suspect that Guzman was responsible for Fernandez's murder.  Based on this information, Detective Arostegui interviewed Guzman several days later.

After being advised of his constitutional rights, Guzman agreed to speak with Detective Arostegui.  Detective Arostegui told Guzman that he was investigating a homicide.  When shown pictures of Fernandez and her apartment building, Guzman denied knowing her or ever having been to her building.  According to Detective Arostegui, Guzman's demeanor was nervous and fidgety at times during the three-hour interview but he repeatedly denied any involvement in the homicide.  During the last forty-five minutes of the interview, Guzman stated that he was sorry two or three times, but he would not explain what he was sorry for.  Detective Arostegui kept talking to Guzman and saying to him, "I know you did it."  Guzman then started asking for bathroom breaks, which struck Detective

---

1. This "information"—which was not introduced at trial—was a "hit" from the FBI's Combined DNA Index System (CODIS), indicating that Guzman's DNA matched the male DNA found at the scene of Fernandez's murder.

Arostegui as "awkward." Guzman eventually invoked his right to counsel, and questioning ceased.

After a DNA standard was obtained from Guzman, the crime lab confirmed that the male DNA profile obtained from the sink and the cup found in Fernandez's apartment matched Guzman's DNA profile. Further analysis in 2005 revealed that two other bloodstains in Fernandez's apartment also matched Guzman's DNA profile. At trial, evidence was presented that the chance of finding the same DNA profile as the profile obtained from the male blood in Fernandez's apartment in an individual at random in the population at large is 1 in 153 trillion. The likelihood of a random match between Guzman and the DNA mixture on the cup in Fernandez's apartment was 1 in 5,099,000.

The medical examiner, Dr. Lew, testified regarding the results of the autopsy performed on Fernandez. According to Dr. Lew, Fernandez was an eighty-year-old woman with an enlarged heart, an artificial heart valve, and flat feet. The autopsy revealed that "the cause of death was multiple stab wounds and trauma to the neck or strangulation." Fernandez suffered a total of fifty-eight stab and incised wounds covering multiple areas of her body. Two of the wounds to her chest penetrated the aorta and were individually fatal. There were also incised wounds to both sides of Fernandez's neck, which would have bled profusely. Many of the wounds to Fernandez's torso were deep enough to penetrate the

abdominal wall but not deep enough to penetrate the bowel or other internal organs. Two of the torso wounds nicked the liver. There were at least five wounds to the fingers, which were likely defensive wounds. Fernandez also suffered blunt trauma to her head while she was still alive, consistent with being struck. Her hyoid bone was fractured, indicating that a great deal of pressure was applied to both sides of her neck. According to Dr. Lew, at least several minutes passed from the time the attack began until Fernandez died.

It appeared to Dr. Lew that Fernandez was either sexually assaulted or an attempt to sexually assault her had been made because her clothing was torn off, her panties were hanging off her right ankle, and bloodstain patterns on her body indicated that her "left leg was raised up enough so that her thigh was contacting her abdomen in order to pull her panties off her left leg." There were also blood smears on the insides of her thighs, which likely indicated that bloodied hands tried to push her thighs apart. Although there was no trauma to the vaginal area, Dr. Lew testified that the absence of trauma was not conclusive evidence that no sexual assault occurred.

Guzman did not testify at trial, and the defense rested without calling any witnesses. The jury found Guzman guilty of first-degree murder.

**B. Penalty Phase**

At the penalty phase, the State introduced a certified copy of the judgment evincing Guzman's prior convictions for attempted felony murder, lewd or lascivious battery on a child twelve years of age or older but less than sixteen years of age, and aggravated battery causing great bodily harm. The State also elicited victim impact evidence and recalled Dr. Lew to testify further about the injuries Fernandez received during the attack.

Guzman presented testimony from a number of his family members. The sum of their testimony established the following. Guzman was born into poverty in Peru. Guzman's father disciplined Guzman and his brother with whippings. Guzman's parents had a troubled relationship until his father left the family to marry another woman when Guzman was around six or seven years old. After the separation, Guzman's mother started drinking, and the boys were sometimes sent to live with their grandmother.

When he was in his teens, Guzman started drinking and cutting himself. His drinking eventually led to many negative consequences, including eviction, deportation, termination of employment, and convictions for driving under the influence. In the late 1990s, Guzman moved to California, where some of his family members had relocated. He attempted to reunite with his father in California, but his father rejected him.

Shortly before Fernandez's murder, Guzman lived with his brother, Juan Carlos, for a few months in Miami before Juan Carlos was deported. During that time, Guzman began to drink heavily, appeared depressed, was cutting himself, and was angry at his father. After his arrest in this case, Guzman "came to an understanding of peace" about his relationship with his father, who died before the trial.

Guzman presented testimony from three expert witnesses. Two of the experts opined that Guzman was under extreme emotional distress at the time of the murder and discussed numerous points of nonstatutory mitigation, focused mainly on Guzman's upbringing, substance abuse, and cognitive functioning. The third expert testified that he saw nothing in Guzman's incarceration records to indicate that Guzman would be dangerous during future incarceration.

Three volunteer prison chaplains testified that Guzman is a man of faith who conducts religious services in the jail. An inmate from Guzman's pod at the jail testified about the Bible study Guzman conducts in the pod and his belief that Guzman is remorseful and rehabilitated.

Guzman did not testify at the penalty phase. The jury recommended a sentence of death by a vote of seven to five.

### C. Sentencing

The trial court concluded that four aggravating circumstances were proven beyond a reasonable doubt: (1) the capital felony was especially heinous, atrocious, or cruel (HAC) (extremely great weight); (2) Guzman was previously convicted of another capital felony or of a felony involving the use or threat of violence (great weight); (3) the capital felony was committed while Guzman was engaged in or attempting to commit a sexual battery (some weight); and (4) the victim of the capital felony was particularly vulnerable due to advanced age or disability (considerable weight). And after having considered and rejected the extreme mental or emotional disturbance mitigating circumstance and four nonstatutory mitigating circumstances,[2] the trial court found that no statutory mitigating circumstances and twenty-five nonstatutory mitigating circumstances were established.[3] In following the jury's recommendation and imposing a sentence of

_____

2. The four proffered and rejected nonstatutory mitigating circumstances were: (1) Guzman has a brain that did not fully develop due to nutritional deficiencies, hazardous environmental conditions and the extreme poverty he experienced growing up; (2) Guzman has suffered malnutrition; (3) Guzman began a change in his life before he dedicated his life to God and before he became aware of the homicide charge; and (4) Guzman has a son and daughter who need his parental guidance.

3. The nonstatutory mitigating circumstances found by the trial court were: (1) Guzman suffers from mild/moderate and severe cognitive deficits and impairments (little weight); (2) Guzman has borderline intellectual functioning, slightly higher than that of a fully intellectually disabled person (minimal weight); (3) Guzman has mental impairments that prevent him from functioning consistently in a job or maintaining appropriate social relationships (miniscule weight); (4) Guzman witnessed the traumatic domestic abuse of his mother and

death, the trial court concluded that the HAC and prior violent felony aggravators each substantially outweighed all of the mitigation presented.

## II. ANALYSIS

brother (slight weight); (5) Guzman was repeatedly brutally and physically abused by his father (little weight); (6) Guzman has a mother who became an alcoholic, and drank during her pregnancy (slight weight); (7) Guzman was neglected by his parents, abandoned by his father, and experienced a transient home life separated by periods of homelessness (little weight); (8) Guzman was not allowed in his father's house when he moved to California, rejected a second time (minor weight); (9) Guzman was angry and resentful towards his father, and that bitterness affected his judgment (little weight); (10) Guzman has a serious and severe alcohol and drug problem (slight weight); (11) Guzman has a personality character disorder that prevents him from developing healthy attachments to others (little weight); (12) Guzman suffers from depression, paranoia, cognitive impairment, anger management issues, personality disintegration, mild to moderate psychological distress, and exhibits symptoms of psychosis or inappropriate emotions (minor weight); (13) Guzman lacks education, having dropped out of school in the sixth grade (slight weight); (14) Guzman has a loving daughter who wants to maintain a long-distance relationship with him (little weight); (15) Guzman has a young son whose mother wants to maintain a long-distance relationship with him (minimal weight); (16) Guzman has had excellent jail behavior for ten years (little weight); (17) Guzman will not be a future danger to inmates and correctional officers in the prison system (slight weight); (18) Guzman is stable in a structured environment without alcohol (minor weight); (19) Guzman has dedicated his life to ministering the word of God as a mentor and rehabilitator for other inmates (slight weight); (20) Guzman has dedicated his life to God's service and has repented (slight weight); (21) Guzman has expressed remorse (little weight); (22) Guzman grew up very poor and without running water and electricity (miniscule weight); (23) Guzman has a mother who wants to maintain a long-distance relationship with him (little weight); (24) Guzman has family from California and Peru who want to maintain a long-distance relationship with him (little weight); and (25) Guzman has emotional scars that will last a lifetime (slight weight).

- 9 -

Guzman raises two guilt phase issues and six penalty phase issues on appeal. We address both of Guzman's guilt phase issues as well as the sufficiency of the evidence, but as to the penalty phase, we address only the dispositive issue.

## A. References to Jail and Possible DNA Match

Guzman first argues that the trial court erred in denying his motions for mistrial during the guilt phase after the State elicited testimony suggesting that Guzman was in jail on other charges during the investigation of Fernandez's murder and that his DNA was in a database of offenders.

At trial, Carolyn Grayer, a crime scene investigator, testified that on April 20, 2004, she collected buccal swabs from Guzman in order to obtain a DNA standard for comparison to DNA left at the scene of Fernandez's murder. During her testimony, Grayer stated that she "went with Detective Arostegui to [M]etro West jail." Guzman objected, moved to strike the statement, and moved for a mistrial, arguing that the jury had heard the statement and it would not be possible to "unring the bell." The trial court granted the motion to strike, denied the motion for mistrial, and instructed the jury: "[P]lease disregard that last question and answer. Where this incident occurred with regard to the DNA swab is of no concern to you, and it shouldn't be considered further by you."

After CSI Grayer's testimony, Detective Arostegui was called to discuss the steps he took in his investigation. At one point during his testimony, Detective

Arostegui stated, "the next thing that occurred is on March 9, 2004, I was told that there was a possible DNA match." Guzman objected to hearsay and again moved to strike the statement and for a mistrial. The trial court again granted the motion to strike but denied the motion for mistrial. The court instructed the jury to "disregard the last statement by Detective Arostegui." The court also instructed the State to proceed by asking Detective Arostegui, "Did you develop through your investigation any other leads of individuals that you might want to speak to?" The State complied.

The denial of a motion for mistrial is reviewed for abuse of discretion. Gosciminski v. State, 132 So. 3d 678, 695 (Fla. 2013). "The granting of a motion for mistrial is not based on whether the error is 'prejudicial.' " Scott v. State, 66 So. 3d 923, 931 (Fla. 2011). "Rather, the standard requires that a mistrial be granted only 'when an error is so prejudicial as to vitiate the entire trial,' such that a mistrial is 'necessary to ensure that the defendant receives a fair trial.' " Gosciminski, 132 So. 3d at 695-96 (citations omitted). "Under the abuse of discretion standard of review, a ruling will be upheld unless the ruling is 'arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.' " Banks v. State, 46 So. 3d 989, 997 (Fla. 2010) (quoting Lugo v. State, 2 So. 3d 1, 19 (Fla. 2008)).

Guzman asserts that CSI Grayer's reference to the jail gave the jury the impression that Guzman was incarcerated for a different crime at the time that the buccal swabs were obtained. While Grayer's statement did indicate that Guzman was in jail at the time the buccal swabs were obtained, and he was indeed in jail, the only charge for which he was in custody at that time was Fernandez's murder. There is no reason to believe that the jury speculated that Guzman was in jail on another charge rather than Fernandez's murder. There was no testimony during the guilt phase that Guzman was charged with or convicted of any other crimes, and "a reasonable juror would know that [the defendant] had been in jail for at least some period of time prior to trial because he was charged with first-degree murder." Snipes v. State, 733 So. 2d 1000, 1005 (Fla. 1999). Even if the jurors might have inferred that Guzman was jailed for a different crime, the reference to the jail was brief, isolated, inadvertent, and not so prejudicial as to vitiate the entire trial. See Fletcher v. State, 168 So. 3d 186, 207 (Fla. 2015) ("A comment [regarding a defendant's prior imprisonment] that is brief, isolated, and inadvertent may not warrant a mistrial."), cert. denied, 136 S. Ct. 980 (2016). Thus, the trial court did not abuse its discretion in denying the motion for mistrial.

Guzman argues that the reference made by Detective Arostegui to "a possible DNA match" "had the unmistakable effect of telling the jury that Mr. Guzman's DNA was already in a database of criminal offenders." We disagree.

As previously stated, there was no evidence introduced at the guilt phase that Guzman was charged with or convicted of any prior crimes, nor was there any evidence that his DNA was in a database of criminal offenders. Further, the comment was brief, isolated, inadvertent, and the jury was instructed to disregard it.

In Braddy v. State, 111 So. 3d 810, 837 (Fla. 2012), the defendant moved for a mistrial based on a detective's testimony regarding the events leading up to Braddy's arrest:

> [W]hen I noticed Mr. Braddy's demeanor, how it changed, and for our safety, due to the circumstances, I placed handcuffs on him. I advised him I was going to handcuff him, he wasn't under arrest at the moment, but it was for his safety and my safety dealing with the history that I had of him.

(Alteration in original.) Braddy argued that the statement improperly informed the jury of his violent criminal past. We disagreed, explaining:

> Prior to the challenged testimony, Detective Milito had testified that he was dispatched to Braddy's home after learning that Braddy had been implicated in a violent kidnapping, attempted murder, and possible murder of a child. Given this information and the change in Braddy's demeanor upon being confronted, Detective Milito's reference to Braddy's history could most reasonably be interpreted in context as referring to the facts of the crime that was being investigated. The trial court therefore did not abuse its discretion in denying Braddy's motion.

Braddy, 111 So. 3d at 837.

- 13 -

At the point in Guzman's trial when Detective Arostegui mentioned "a possible DNA match," the jury had already learned from earlier witnesses that Guzman's DNA matched the male DNA found in blood and on the cup at the crime scene, and that DNA analysis was conducted more than once in this case. As in Braddy, Detective Arostegui's testimony did not implicate Guzman in prior criminal activity but would "most reasonably be interpreted in context as referring to the facts of the crime that was being investigated." Thus, the trial court did not abuse its discretion in denying the motion for mistrial.

## B. Improper Comments During the State's Closing Arguments

In his second guilt phase claim, Guzman asserts that he is entitled to relief based on improper arguments made by the State during closing arguments. Guzman alleges that the State improperly inflamed the jury, shifted the burden of proof, and commented on Guzman's right to remain silent. Because Guzman concedes that he failed to object to any of these statements, we review each only for fundamental error. See Brooks v. State, 762 So. 2d 879, 898-99 (Fla. 2000) ("As a general rule, this Court has determined that failing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that reaches down into the

- 14 -

validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.") (citations omitted)).

## 1. Inflaming the Jury

Guzman asserts that the State improperly inflamed the jury in order to gain an emotional response by the manner in which it began and ended its guilt phase closing argument. The State began its initial closing argument by stating: "Members of the jury, horrific, an atrocity, gruesome, ghastly, grizzly. What word would you use to describe this indescribable and unthinkable murder?" At the end of the argument, the prosecutor stated: "And Lola unwittingly opened that door to death, destruction, torture, and pain, and his name is Victor Guzman, and he knows it."

Assuming that these arguments were improper, we conclude that they do not rise to the level of fundamental error and therefore Guzman is not entitled to relief.

## 2. Burden Shifting

Guzman next argues that the State improperly shifted the burden to the defense by stating that defense counsel should answer some questions, including: "What evidence is there . . . that mistakes are made in this case?"; "What evidence in this case is there of contamination?"; and "Why did Defendant Guzman apologize to Detective Arostegui?"

> "It is well settled that due process requires the [S]tate to prove every element of a crime beyond a reasonable doubt." "For that

reason, it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt."

Warmington v. State, 149 So. 3d 648, 652 (Fla. 2014) (citations omitted).

### a. DNA Evidence

In opening statement and during cross-examination throughout the trial, Guzman put forth a theory that the match between his DNA and the male DNA left at the crime scene might have been the result of a mistake or contamination, rather than a valid match. Guzman asked the jury in his opening statement to keep in mind that the processing of evidence for DNA analysis is done by "imperfect human beings." He told the jurors that it will be up to them to decide whether the State proved that it was truly his DNA in Fernandez's apartment.

The evidence presented at trial was that Guzman's DNA profile matched the male DNA found in blood in Fernandez's apartment and that the probability of a random match of that DNA profile in the population at large is 1 in 153 trillion. The crime scene investigators and DNA analysts testified extensively about the processes used in collecting and processing DNA and the care that is taken and procedures that are in place in order to avoid contamination or mistake in the collection and analysis of DNA. The head of the crime lab, Commander Stoiloff, testified that any mistake or violation of standard operating procedures would have

been brought to her attention, but no mistake or violation that had any relation to this case was brought to her attention.

In its closing argument, the State addressed the theory that the DNA match was the result of a mistake, arguing:

> I'll call it the imperfect human being theory. Human beings are imperfect. They make mistakes. DNA analysts are human. And, therefore, it's possible that the DNA analysts made a mistake in this case according to this theory, but you've got to look at the evidence. Where in the evidence is it that Commander Stoiloff even possibly made a mistake? Where is it in the evidence that Supervisor Wolson even possibly made a mistake in this case. And it's not in the body of evidence that you follow this case. It's imaginary, it's speculative, and it's forced. It doesn't give you a reasonable doubt whether Defendant Guzman left his blood behind by the bed, on the floor in front of the kitchen sink, and at the kitchen sink.

The State then discussed the theory that the DNA match was the result of contamination of the evidence. The State recounted the manner in which the DNA evidence was collected and analyzed and then referenced testimony elicited from one of the DNA analysts at trial, stating:

> And then [defense counsel] asked Commander Stoiloff about this molecular biology science trying to assess the validity of it before you, and he said something to the effect of Commander Stoiloff, well these molecules [of DNA] aren't they just floating all around and they can get contaminated with all the other stuff? Commander Stoiloff was very clear about that. These molecules aren't just floating around. This DNA analysis is done in a controlled environment[], special care is taken, the evidence is not touched with other evidence in this case, they wear these white lab coats, they make sure everything is sterile in there, they use controls, negative controls, positive controls. No. These molecules aren't just flying around.

There is no contamination in this case. There's no evidence in the body of evidence for your consideration of contamination.

. . . State's exhibit 61 . . . . This was the DNA swabs from the recliner[,] . . . the west side of the bedroom, the armrest, and the backrest. This evidence is taken in the year 2000. Sealed. And Defendant Guzman's DNA, his standard was taken four years later by Detective Arostegui with Crime Scene Investigator Grayer. It's in a separate sealed envelope. When did these worlds collide? When was there any co-mingling with this stuff? There was not contamination of this evidence. Defendant Guzman['s] standard didn't slip into this other evidence. It's not the evidence in this case.

Guzman argues that the State shifted the burden of proof to the defense by posing the question to defense counsel "[W]hat evidence in this case is there of contamination?" and pointing out that the defense counsel "didn't take out any of this evidence and show you, ah, this is what happened, this is where the contamination took place, because there's no evidence of contamination in this case."

Here, the State did not invite the jury to convict Guzman for some reason other than that the State proved its case beyond a reasonable doubt by arguing that there was no evidence of contamination introduced during the trial. The State's case included evidence regarding the methods used in collecting and analyzing the evidence in this case and the care taken by those who processed the crime scene and analyzed the evidence to ensure that no mistakes were made and the evidence was not contaminated. And even if we were to assume that the State improperly directed a question to defense counsel and commented on the defense's failure to

- 18 -

produce evidence of contamination, any such impropriety would not constitute fundamental error rising to the level that the conviction could not have been obtained without the assistance of the alleged error. Thus, Guzman is not entitled to relief.

### b. Apology

During the trial, Detective Arostegui testified that when he interviewed Guzman in 2004, Guzman denied any involvement in Fernandez's murder but stated that he was "sorry" two or three times and would not explain why he said he was sorry. On cross-examination, Guzman asked Detective Arostegui if he knew why Guzman said he was sorry during the interrogation. Detective Arostegui admitted that he did not. During closing arguments, the State posed "another question for [defense counsel]: Why did Defendant Guzman apologize to Detective Arostegui?" Even assuming that this question improperly shifted the burden because it was posed directly to defense counsel, any impropriety did not rise to the level of fundamental error such that the conviction could not have been obtained without the error.

To the extent that Guzman argues that the prosecutor's question was an improper comment on Guzman's right to remain silent, we disagree. Prior to his interview with Detective Arostegui, Guzman was advised of his constitutional rights and expressly waived his right to remain silent. He thereafter freely

conversed with Detective Arostegui, refusing only to tell him why he said he was sorry. We therefore conclude that the prosecutor's argument was not an improper comment on Guzman's right to remain silent. See Downs v. Moore, 801 So. 2d 906, 911-12 (Fla. 2001) (holding that the State is not precluded from admitting evidence of defendant's refusal to answer one question of many where defendant has not invoked his Fifth Amendment rights); Ragland v. State, 358 So. 2d 100, 100 (Fla. 3d DCA 1978) (holding that where defendant waived his Fifth Amendment rights and freely and voluntarily conversed with police, comment on the failure to answer one question of many is not a violation of defendant's right to remain silent).

### 3. Use of Jury Hypothetical as a Comment on Silence

Guzman asserts that the State twice commented on his right to remain silent during closing argument by referencing a hypothetical used by Guzman during voir dire. During voir dire, Guzman asked one of the veniremen, a retired teacher, if he would want to hear from "both sides" regarding a disruption in his classroom. The juror stated that he would. Guzman took that opportunity to explain to the venire that the way the retired teacher felt is a natural way to feel, but in the context of a criminal trial, "we have to train ourselves" away from wanting to hear both sides of a story. Guzman then gave the venire a hypothetical situation in which one student said another student hit him, and the second student denied it. Guzman asked the

retired teacher: if the accused student refused to talk, would he automatically believe the first student's claim that he was hit or would he "have to look at the student who was talking and . . . weigh their credibility?" Guzman's point in asking the question was that even if the State presents "some evidence, but if you weigh the evidence and it doesn't meet the burden [of proof beyond a reasonable doubt], then the verdict is not guilty."

During its closing argument, the State referenced this portion of Guzman's voir dire, saying:

> During the voir dire when you jurors were beginning to get selected in this case, there[ was] a discussion by opposing counsel about credibility. Defense counsel used the example of two kids in a classroom. One kid hits the other, the teacher asks the students, all right, did you hit him, and the student says no. And then he changes that example a little bit and he says, then what do you do with the student who doesn't say anything? In this case, what you have are the DNA analysts, and they're not saying one thing. I mean, the[ir] testimony doesn't conflict, it complements each other. It corroborates each other. There's no conflict in the testimony. This is not a case about credibility.

Guzman then raised a general objection stating, "Objection, Your Honor: [r]eserve a motion." After the State's initial closing and Guzman's closing but prior to the State's rebuttal closing, Guzman explained to the court the basis for the objection he made when the State referenced the student hypothetical. Guzman argued that because the State "was commenting on the credibility of the other side," and Guzman did not testify or present any evidence in his case, the State was actually

commenting on Guzman's failure to testify and present evidence. Guzman also moved for a mistrial at that time. In overruling the objection and denying the motion for mistrial, the trial court concluded that the State's comment was not a comment on Guzman's credibility but a response to "a perceived argument from [Guzman] of contrasting the credibility of the two DNA experts that testified." Guzman concedes that he failed to properly preserve this argument for review. We therefore review it only for fundamental error.

It is clear from the entire context of the trial that the student hypothetical was not used by the State to comment on Guzman's failure to testify at trial. During voir dire, the example was used not only to discuss a defendant's right to remain silent but also to explain to the jury that even if the defense presents no evidence, the jury must still weigh the credibility of the State's evidence. In closing, the State used the example to argue that the jury should find the testimony of the State's DNA analysts credible because their testimony was consistent. Even if the State's use of the student hypothetical in closing could be construed as a comment on silence, it would not rise to the level of fundamental error. Moreover, even if Guzman's objection were preserved through his subsequent motion for mistrial and explanation for the basis of the objection, we would conclude that the trial court did not abuse its discretion in denying the motion for mistrial in the context of this case.

- 22 -

## C. Sufficiency of the Evidence

Although Guzman does not challenge the sufficiency of the evidence to sustain his conviction for first-degree murder, this Court independently reviews the record in death penalty cases to determine whether competent, substantial evidence supports the conviction. Fla. R. App. P. 9.142(a)(5) ("On direct appeal in death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief."). Our duty on appeal is "to review the record in the light most favorable to the prevailing theory and to sustain that theory if it is supported by competent[,] substantial evidence." Orme v. State, 677 So. 2d 258, 262 (Fla. 1996). However, if the State's evidence of guilt is wholly circumstantial, "not only must the evidence be sufficient to establish each element of the offense" but it must also be "inconsistent with any reasonable hypothesis of innocence proposed by the defendant." Twilegar v. State, 42 So. 3d 177, 188 (Fla. 2010). "The [S]tate is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the Defendant's theory of events." Kocaker v. State, 119 So. 3d 1214, 1225 (Fla. 2013) (quoting Durousseau v. State, 55 So. 3d 543, 557 (Fla. 2010)).

Guzman's conviction is based on the fact that the DNA profile obtained from the male blood discovered in multiple areas around Fernandez's apartment matched Guzman's DNA profile, with the chances of a random match in the population at large being 1 in 153 trillion, and the fact that Guzman denied knowing Fernandez or having even been to her apartment building. There was no connection established between Guzman and the victim other than the fact that they both lived in Miami at the time of the murder. There were no eyewitnesses, no confession, and no fingerprints or other forensic evidence. The murder weapon was never identified. Although the evidence was wholly circumstantial, Guzman offered no reasonable hypothesis of innocence at trial other than to argue the possibility that a mistake was made or contamination occurred during the collection and processing of the DNA evidence, which led to an error in the analysis and a false "match." But the detailed testimony about the steps taken to avoid any mistake or contamination from those who collected the evidence from the crime scene and processed the evidence at the crime lab—which was unimpeached and unrebutted—provided competent, substantial evidence of a valid DNA match, which was inconsistent with Guzman's theory of events.

Further, although the State presented no direct evidence or testimony regarding how Guzman's blood came to be in Fernandez's apartment or the age of the bloodstains matching Guzman's DNA profile, the effect of the blood evidence

in this case went beyond merely placing Guzman at the scene at some unknown time and, for the following reasons, actually implicated him in the murder. First, Guzman's blood was located in several areas throughout the apartment, in large enough amounts to be clearly visible to the naked eye. Fernandez was stabbed or cut fifty-eight times, and the wounds had clean edges, consistent with the blade of a knife. Blood was found on the hose in the kitchen sink and blood matching Guzman's DNA profile was visible inside the kitchen sink. From these facts it can be inferred that Guzman cut himself while stabbing Fernandez and cleaned up in the kitchen sink after the murder. It can be inferred that Guzman's blood was not deposited inside the kitchen sink at some time remote to the murder since it had not washed down the drain. It could also be inferred based on testimony that Fernandez's apartment was otherwise "neat and tidy" that the other blood matching Guzman's DNA profile was deposited at the time of the murder.

The jury was instructed on theories of both premeditated murder and felony murder, with the underlying felony being attempted sexual battery. The jury returned a general verdict of guilty of first-degree murder without specifying whether the State proved first-degree murder, felony murder, or both.

To establish first-degree premeditated murder, the State was required to prove the following elements: (1) Severina Fernandez is dead; (2) the death was caused by the criminal act of Guzman; and (3) there was a premeditated killing of

- 25 -

Severina Fernandez. Fla. Std. Jury Instr. (Crim.) 7.2. "Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." Asay v. State, 580 So. 2d 610, 612 (Fla. 1991). "Premeditation is a factual issue to be determined by the jury and, like other factual matters, may be established by circumstantial evidence." Twilegar, 42 So. 3d at 190. The deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can support a finding of premeditation. Jackson v. State, 180 So. 3d 938, 956 (Fla. 2015), cert. denied, 136 S. Ct. 2015 (2016). The evidence established that Fernandez was an eighty-year-old woman who suffered fifty-eight stab and incised wounds to her neck, abdomen, hands, arms, and chest—two of which were individually fatal—as well as blunt-force trauma to her head, and that the attack started in another room before ending in the bedroom. The whole of these facts provides competent, substantial evidence to support a finding of premeditation.

To prove first-degree felony murder, the State was required to prove the following three elements: (1) Severina Fernandez is dead; (2) the death occurred as a consequence of and while Guzman was attempting to commit sexual battery on Severina Fernandez; and (3) Guzman was the person who actually killed Severina Fernandez. Fla. Std. Jury Instr. (Crim.) 7.3. The evidence presented established

that Fernandez's dress was forcibly removed during the attack, and her panties were pulled down and left hanging off of one ankle. Bloodstain pattern evidence on Fernandez's body indicated that her left leg was raised up during the attack high enough to contact her abdomen. There were also blood smears on the insides of her thighs, which indicated that bloodied hands were used to push her legs apart. The absence of trauma to the genital area and of sperm on the vaginal swabs did not conclusively establish that no sexual battery occurred. The totality of this evidence provides competent, substantial evidence to support a finding that Fernandez's death occurred as a consequence of and while Guzman was attempting a sexual battery and therefore to sustain a felony-murder conviction.

## D. Hurst

During the pendency of Guzman's appeal, the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616, 619 (2016), in which it held that Florida's former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." On remand in Hurst v. State, 202 So. 3d 40, 57 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017), we held that

before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

In light of the nonunanimous jury recommendation to impose a death sentence, it cannot be said that the failure to require a unanimous verdict was harmless. See Franklin v. State, 41 Fla. L. Weekly S573, S575 (Fla. Nov. 23, 2016) ("In light of the non-unanimous jury recommendation to impose a death sentence, we reject the State's contention that any Ring[ v. Arizona, 536 U.S. 584 (2002)]- or Hurst v. Florida-related error is harmless."). We therefore reverse Guzman's death sentence and remand for a new penalty phase.

### III. CONCLUSION

For the foregoing reasons, we affirm Guzman's conviction of first-degree murder, vacate Guzman's death sentence, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY and POLSTON, JJ., concur as to the conviction but dissent as to the sentence.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Miami-Dade County,
    Dennis James Murphy, Judge - Case No. 132004CF0153890001XX

Carlos J. Martinez, Public Defender, and Andrew Stanton, Assistant Public Defender, Eleventh Judicial Circuit, Miami, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Charmaine M. Millsaps and Berdene B. Beckles, Assistant Attorneys General, Tallahassee, Florida,

    for Appellee