# DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

**JASON BRYON NEBERGALL,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D18-2327

[January 8, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Cheryl A. Caracuzzo, Judge; L.T. Case No. 502016CF011962A.

Michael Salnick of Law Offices of Salnick & Fuchs, P.A., West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Kimberly T. Acuña, Assistant Attorney General, West Palm Beach, for appellee.

### *ON APPELLEE'S MOTION FOR REHEARING, REHEARING EN BANC, AND CLARIFICATION/CORRECTION OF OPINION*

GERBER, J.

We deny the state's motion for rehearing, rehearing en banc, and correction of opinion.

However, we grant the state's motion for clarification, which seeks to include further trial transcript facts in the opinion, in the event the state petitions for review in the Florida Supreme Court. *See Wells v. State*, 132 So. 3d 1110, 1111 (Fla. 2014) ("As in all petitions seeking this Court's discretionary jurisdiction pursuant to article V, section 3(b)(3), we are confined to consider only those facts contained within the four corners of the district court's majority opinion.").

We therefore substitute this opinion for our original opinion which we issued on November 6, 2019, and include the further trial transcript facts which the state has requested in this substituted opinion.

The defendant appeals from his convictions on one count of attempted sexual battery (victim eighteen years of age or older) while in possession of a weapon, and one count of simple battery.

The defendant primarily argues the trial court erred in denying his motion for mistrial after the alleged victim intentionally violated the trial court's clarified order on a motion in limine. The order provided, in pertinent part, that any testimony regarding law enforcement's efforts to identify the DNA found on the alleged victim's buttocks could only indicate that such efforts were "inconclusive." However, during the alleged victim's cross-examination, in response to one of defense counsel's questions not related to DNA, the alleged victim ended her answer by exclaiming, "You see the DNA results on me. And now you guys say the DNA's not on my butt, but it was on my butt. It was enough -- ."

We agree with the defendant that the trial court erred in denying his motion for mistrial. The alleged victim's comment deprived the defendant of a fair trial, reasonably may have materially contributed to his conviction, and was so harmful or fundamentally tainted as to require a new trial. We also conclude that a curative instruction would not have remedied this violation. We are compelled to reverse and remand for a new trial.

We present this opinion in five parts:
1. The allegations;
2. The DNA evidence and the defendant's motion in limine;
3. The defendant's motion for mistrial;
4. The trial court's denial of the motion for mistrial; and
5. Our review.

### 1. *The Allegations*

#### a. **The State's Case**

At the time of this incident, the defendant was a sheriff's deputy. Early one morning around 5:30 am, he and two other deputies were dispatched to the alleged victim's home to investigate an altercation between her and her landlord. The altercation had been investigated by other deputies earlier in the night.

The defendant and the other two deputies arrived at the alleged victim's home in separate vehicles. By the time they arrived, the landlord had left the scene. The alleged victim was standing outside. The defendant introduced himself by his first name, and then spoke to her away from the

other deputies.  She told the defendant that her landlord kept coming to her home and threatening her.

The defendant told the alleged victim that he was not trying to downplay her story, but he did not intend to write a report because his shift was ending.  He offered to come back and check on her another time.  She responded that would be okay.  The defendant and the other deputies then drove away in separate vehicles.

Just minutes later, the defendant returned to the alleged victim's home.  The defendant did not notify the other two deputies or dispatch that he was doing so.  When the defendant, still in uniform, got to the alleged victim's home, he knocked on the door, and identified himself as "PBSO."  The alleged victim came outside.

What allegedly happened next became the subject of the charges and trial.

The alleged victim testified in pertinent part as follows.  When she came outside, the defendant said, "I told you I was gonna come back and check on you."  The defendant then grabbed her by the hair and kissed her on the mouth.  He said, "Too much light here," and led her around to the back of her home.  When they got around back, he said, "I had to come back and check on these big a** t******."  He pulled up her top, and sucked on her left breast.  Then he started kissing the left side of her neck.  He said "[H]ave you ever had white c***?  Do you like it in your a**?"  She did not respond.  He put his hand down her shorts, and touched her vagina.  He grabbed her right hand, unzipped his pants, pulled out his penis, and said "touch it," but she did not.  He told her to "give me h***," but she said no.  He turned her around, pulled down her shorts, and rubbed his penis on her buttocks.  He tried to penetrate his penis between her buttocks, but he said, "I can't do this.  I don't have a condom."  He then said, "I'll be back.  I'll check on you," and left her home.

The alleged victim went back inside her home and notified her roommates.  She called the sheriff's office to get the defendant's last name and badge number.  She did not immediately report the incident itself to the sheriff's office, but did so later that day at the urging of her roommates and family.  When she reported the incident, she initially would not provide her name because she feared for her safety.

The alleged victim was directed to a hospital's sexual assault treatment center, where DNA samples were taken from her right hand fingernails, the upper and lower areas between her buttocks, the left side of her neck,

and her left breast at the nipple and areola. A DNA sample was not taken from the alleged victim's vagina because she informed the treating nurse that she had not been vaginally penetrated.

The alleged victim ultimately identified herself and provided statements to the treating nurse, and to sheriff's office detectives from the sexual assault division who were sent to the hospital to investigate.

The next day, the detectives pulled the GPS records of the defendant's location from the previous night. The GPS records showed that when the defendant returned to the alleged victim's home by himself, he had remained at the home for approximately eleven minutes. The detectives also obtained a search warrant for the defendant's DNA and uniform.

The detectives went to the defendant's neighborhood to interview him about the incident. One of the detectives took the lead. That detective read the defendant his *Miranda* rights. The defendant responded that he understood his rights. He then stated he did not know what was going on, but he agreed to be interviewed.

The detective asked the defendant what occurred when he responded to the alleged victim's home. The defendant said that he and two other deputies were dispatched to the alleged victim's home to investigate the earlier altercation between the alleged victim and her landlord. The alleged victim did not want her landlord to come back to her home. She described her landlord's vehicle. The defendant told the alleged victim to change the lock on her home, and if her landlord came back, to call the sheriff's office. The defendant and the other deputies then left. The defendant told the detective that as he was leaving the neighborhood, he saw a vehicle fitting the description of the landlord's vehicle turn into the neighborhood. The defendant turned around and drove back by the alleged victim's home, but the vehicle he saw was not in the area. The defendant first told the detective that the alleged victim was standing outside of her home. The defendant then told the detective that he knocked on the alleged victim's door. The defendant said he asked the alleged victim if her landlord had come back. The alleged victim said no. The defendant said he then talked to the alleged victim for a couple minutes, and then he left. The detective asked the defendant, "Did you touch her at all?" The defendant responded "No." The detective then asked, "Did she touch you?" The defendant again responded "No." The interview then ended.

The detectives obtained DNA samples from the defendant. After obtaining test results comparing the DNA profiles from the alleged victim's

body to the defendant's DNA profile (discussed further below), the detectives arrested the defendant.

The state ultimately charged the defendant with three counts: (1) attempted sexual battery (victim eighteen years of age or older) while in possession of a weapon, for the defendant's penis having union with the alleged victim's anus or vagina; (2) simple battery for touching her vagina; and (3) simple battery for touching her breasts.

At trial, the alleged victim and the detectives testified consistently with the summaries provided above.

The state also presented the testimony of one of the other deputies who responded to the alleged victim's home. The other deputy testified that after he and the defendant drove away from the alleged victim's home, the defendant's vehicle separated from the other deputy's vehicle on a road farther away from the alleged victim's neighborhood, thus contradicting the defendant's statement that he turned his vehicle around immediately after he left the alleged victim's neighborhood.

## b. **The Defendant's Testimony**

The defendant chose to testify at trial, and testified as follows. After he returned to the alleged victim's home, he knocked on her door, and identified himself as a sheriff's deputy. The alleged victim opened the door and came outside. The defendant told her he had come back because, as he was leaving the neighborhood, he had seen a vehicle fitting the description of the landlord's vehicle entering the neighborhood. The defendant asked the alleged victim if she had any further issues or if anybody came back in the time since he and the other deputies left her home. She said no. The defendant again told her to change the lock on her home, and that if she had any further issues, to contact the sheriff's office. At that point, the alleged victim asked, "Would you like to pat me down?", which he thought was strange. The defendant told her no, and to have a good night. The alleged victim then pulled up her top to her neck, exposing both breasts, and asked "Are you sure you don't want to pat me down for weapons?" The defendant was shocked. He told her no again and turned to walk back to his vehicle. Then he felt a nudge on his right forearm. He immediately turned around and saw her with her top still pulled up with both breasts exposed as she leaned into him. The defendant put his hands up immediately and pushed her back, touching one of her breasts in the process. He got in his vehicle and went home.

5

The defendant testified he did not notify a supervisor about the incident, and did not write a report about the incident. When defense counsel asked why not, the defendant said, "I was just trying to minimize the situation. I wasn't trying to escalate it to any level or cause any kind of further embarrassment to [the alleged victim]. And it really was a non-issue for me at the time."

When defense counsel asked the defendant why he responded "No" to the detective's question, "Did you touch her?", the defendant said, "I knew [the detective was in the sexual assault division]. And the way I interpreted his question with the type of investigation he was doing, I interpreted it as he was asking me if I touched her with any kind of sexual motivation. And my answer was clearly no then and no today."

When defense counsel asked the defendant why he responded "No" to the detective's question, "Did [the alleged victim] touch you?", the defendant said, "I interpreted the question the same way, as did [she] try to touch me in a sexual way or sexual manner. And she did not."

When defense counsel asked the defendant why he did not tell the detective that the alleged victim exposed herself to him, he said, "Still at the time, it was -- it was -- in my mind at the time, it was a minor issue. And I -- it was a minor issue at the time."

The defendant denied all other actions to which the alleged victim testified.

## 2. *The DNA Evidence and the Defendant's Motion in Limine*

Two sheriff's office forensic scientists analyzed the samples taken from the alleged victim. One scientist analyzed for autosomal DNA, which is the combined DNA from both an individual's mother and father. The other scientist analyzed for Y-STR DNA, which looks only at the male DNA present.

On the sample taken from the alleged victim's right hand fingernails, the autosomal DNA indicated the presence of three individuals. The major profile was determined to be consistent with the alleged victim's DNA profile. No comparisons were done for the minor contributors of this sample. No Y-STR analysis was done.

On the sample taken from the upper area between the alleged victim's buttocks, the autosomal DNA indicated the presence of three individuals. The major profile was determined to be consistent with the alleged victim's

DNA profile. No comparisons were done for the minor contributors of this sample. No Y-STR analysis was done.

On the sample taken from the lower area between the alleged victim's buttocks, the autosomal DNA indicated the presence of at least two individuals. The major profile was determined to be consistent with the alleged victim's DNA profile. No comparisons were done for the minor contributors of this sample. The Y-STR DNA indicated the presence of three males. No conclusions were made from the Y-STR DNA because the mixture was too complex.

On the sample taken from the left side of the alleged victim's neck, the autosomal DNA indicated the presence of at least four individuals. The major profile was determined to be consistent with the alleged victim's DNA profile. No comparisons were done for the minor contributors of this sample. The Y-STR DNA indicated the presence of at least five males. No conclusions were made from the Y-STR DNA because the mixture was too complex.

On the sample taken from the alleged victim's left breast, the autosomal DNA indicated the presence of at least four individuals. The entire profile was deemed inconclusive for comparison to anyone because no major profile was detected. The Y-STR DNA indicated the presence of three males. The major profile was determined to be consistent with the defendant's DNA profile. No comparisons were done for the two minor contributors.

Based on the DNA testing results, the defendant filed a pre-trial motion in limine seeking to exclude any testimony that the defendant could not be excluded as a contributor to any DNA profile "found on any item of evidence introduced in this cause, unless it is accompanied by a statistical weight." That motion referred only to the DNA found on the alleged victim's buttocks.

The state agreed to the defendant's motion in limine, and the trial court entered an agreed order granting that motion.

The defendant later filed a motion for clarification relating to the agreed order. According to the motion, the state had expressed the belief that it still could elicit testimony that this particular DNA analysis was "inconclusive," whereas defense counsel believed such testimony was excluded unless the defendant opened the door to such testimony.

The trial court granted the motion for clarification, and entered an order providing, in pertinent part:

> A review of the Motion in Limine indicates Defense was requesting that [the DNA analysts] not be allowed to testify that the "pattern obtained from [the defendant] cannot be excluded" to the pattern from evidence. The Court would have sustained this objection as the statement implies that the [defendant's] pattern may have been "included" in the pattern from the evidence without any statistical support.
>
> However, the Court would allow that the analysis was inconclusive, as that seems to be an accurate statement.

The trial proceeded one month later. The two sheriff's office forensic scientists testified consistently with their analyses above.

The state also presented the testimony of a private sector forensic scientist from whom the sheriff's office's forensic scientists requested further analysis of the DNA samples. This third forensic scientist confirmed that, on the sample taken from the alleged victim's left breast, the Y-STR DNA had a clear major profile which matched the defendant's DNA profile. The third forensic scientist could not say what the manner of contact was between the defendant and the alleged victim's left breast. However, the third forensic scientist testified that "when you have major profiles . . . it suggests that there's been more than just casual contact," and "quick, casual contact typically does not leave very much DNA." The third forensic scientist added, "If you're sucking on a particular individual, that obviously is going to leave a lot more DNA."

### 3. *The Defendant's Motion for Mistrial*

During defense counsel's cross-examination of the alleged victim, the alleged victim violated the trial court's clarified order on the motion in limine when she was asked about an entirely separate topic, that is, why she initially would not provide her name to law enforcement:

> [DEFENSE COUNSEL]: [The officer to whom the alleged victim reported the incident] said he asked you your name at least ten times and you wouldn't give it to him; is that correct?
>
> [ALLEGED VICTIM]: Correct. I was in fear. Didn't want my name to be out.

[DEFENSE COUNSEL]: Okay. And you didn't bother to tell [the officer] that you had the full name of the [defendant]? You just used examples; is that right?

[ALLEGED VICTIM]: Correct, I didn't want -- I wanted [the defendant] to be in trouble, but I wanted to make sure that [the officer] wasn't [the defendant's] friend, that they couldn't come kill me. I was scared. So I didn't want to give out no information, my information or [the defendant's] information. I wanted to go to the top, wherever, the lieutenant. I just wanted them to take the DNA off me. I still didn't want to give my name at all. I still today, I didn't want to be here. I just wanted [the defendant] to get in trouble for what he did. ***You see the DNA results on me. And now you guys say the DNA's not on my butt, but it was on my butt. It was enough --***

(emphasis added).

At that point, defense counsel objected and asked to approach the bench. The trial court directed the alleged victim and the jury to step out of the courtroom. The following discussion then occurred:

[DEFENSE COUNSEL #1]: Judge, I'm going to move for a mistrial.

THE COURT: Okay.

[DEFENSE COUNSEL #1]: There was absolutely no reason in the world for [the alleged victim] to say that there was DNA on her butt. We had a motion in limine and the parties were instructed . . . [The alleged victim] has read the DNA reports, which is her prerogative. I've got no problem with that. But that was an intentional effort on [the alleged victim's] part to get in evidence that is inadmissible. I certainly am not blaming [the state]. But they're stuck with what their witness says. And it's an absolute manifest injustice done intentionally. And there's no way to cure that.

. . . .

THE COURT: . . . I don't think that it was done intentionally. I mean, did [the state] tell her she was not allowed to mention anything about DNA on her butt?

9

**[STATE]:** *She knows that the DNA on her butt is not coming into evidence.*

**THE COURT:** *Okay. So then why would she say that, just out of curiosity?*

**[STATE]:** *I don't know why she would say that.*

THE COURT: Okay.

[STATE]: I can't answer for her. What I would say is that she -- what I -- I don't think that she testified to what was -- that she said "DNA was taken off my butt." But I'm going to -- but the State is going to say is that there isn't any evidence that DNA was swabbed from her butt. There's no evidence right now that's on the record that is positive that [the defendant's DNA] was on her butt . . . So right now, she has not testified as an expert witness saying that --

THE COURT: Saying that they were the defendant's, okay.

[STATE]: -- the defendant's DNA was positive on her butt. So it's the State's position that this is not equal or equivalent to a mistrial. That it's not a violation of a motion in limine. It was cut off right away. She didn't get into it. She's not testifying as an expert to what was found. And I am going to -- and we can bring her in and -- I don't want to even address it with her . . . .

**THE COURT:** Let me ask this. Was DNA -- did you do DNA analysis and her DNA showed -- *but she made it sound like it was his DNA*. I'm not going to -- I mean, let's -- I understand it didn't come out and we may be able to -- I don't know that it rises to a level of mistrial, but --

[STATE]: I would say that I would ask that a curative instruction to be given that the witness -- that there is no --

THE COURT: Okay, hold on. Let's take it in steps. I want everybody to calm down. I think [defense counsel #2] has something to say. So let me hear from him.

. . . .

10

[DEFENSE COUNSEL #2]: If you hear what [the alleged victim] said before that . . . it's specifically telling the jury that there was evidence excluded that she's not supposed to say. And that even more makes it sound that it is [the defendant's] DNA.

. . . .

THE COURT: Yeah, I think -- and that's why I just jotted down the time. . . . So a curative instruction, you're not requesting? You're asking -- I just want to make sure.

[DEFENSE COUNSEL #1]: A curative instruction here would . . . re-ring the bell.

. . . .

**THE COURT:** Okay. So based on the fact that you don't want a curative, I'm going to take the motion for mistrial under advisement. We're going to continue. I will do a playback because it happened so fast, that I don't want to sit here and tell you I don't remember exactly what she said and how she said it. ***I know that it was concerning. I know that we were keeping that out.*** I want to listen to exactly what she said. So I'm going to take the motion for mistrial under advisement. I will do a playback in front of everyone when we have time so that we can all hear it again and digest it. And since there's no curative being requested --

. . . .

[DEFENSE COUNSEL #1]: No, a curative here is not going to undo the taint that has been done.

. . . .

[STATE]: And I don't want to misrepresent to the Court. Her and I have never discussed DNA. I mean, who would talk to their victim about DNA? I mean, I talk to the DNA people about what they're not allowed to do. But I never specific -- I don't want to misrepresent that I sat her down and said "We're not going to talk about the DNA on your butt" because I didn't think anything was going to be elicited in testimony --

11

**THE COURT:**  *Okay.  I'm not really finding that -- right now that it was intentional.  I don't -- unless you told her "We're not getting into DNA.  You're not allowed to talk about DNA" --*

**[STATE]:**  *In a conversation that happened this morning, she emailed me and said "I know that there's no" -- I don't know how she knows this because I didn't -- maybe her and I did talk about it and I just don't remember.  She said "I know we're not allowed to get into DNA."  And I said "We're not talking about that in this trial* and I can't talk to you because you're in the middle of your cross-examination."

. . . .

[DEFENSE COUNSEL #1]:  My only concern is because [the state] didn't discuss DNA with her and she obviously admitted that she's read the DNA reports --

THE COURT:  Yes.

[DEFENSE COUNSEL #1]:  -- that was an intentional comment.  It even makes it stronger.

THE COURT: Okay. I don't need to -- we don't need to address this right now, okay?

[DEFENSE COUNSEL #1]:  Okay.

THE COURT:  I want to bring in the [alleged victim].

. . . .

**THE COURT [addressing the alleged victim]**: . . . *I know that you've heard the objection.  I'm sustaining that objection.  You are not to talk about or discuss anything with DNA.*  That's not your purpose here.  There are witnesses that would have discussed that and will discuss that.  And that's the State's opportunity to present that evidence or not, in accordance with the rulings.  *You talking about DNA is not appropriate.  So I'm instructing you now no more talk about DNA*; just about what happened to you that day, okay?

12

And then I'm going to have to handle a different motion in a little while.

(emphasis added).

At a recess later that day and outside of the alleged victim's and the jury's presence, the trial court had court staff replay the audio recording of the alleged victim's statement three times so the parties could take note of the exact words which the alleged victim used during her comment.

After the state rested at the end of the day, the trial court resumed argument on the defendant's motion for mistrial. Defense counsel, after referring to the alleged victim's statements about the DNA on her buttocks, argued, in pertinent part:

[W]e . . . know from her testimony that she read the DNA report, okay? So she has more information than the jury has. So she's referring to obviously things that are not in evidence. And she is saying things that are in that report. "You see the DNA results," which again the jury doesn't have.

And the next statement "And now you guys say DNA not on my butt," . . . and then the next one, "But there was DNA on my butt." ***It's illogical and defies common sense to think that she's talking about someone else's DNA on her. . . . She's not talking about a third person. She's only talking about the defendant*** . . . .

And her statement in essence then gives the jury or tells the jury that there's even more -- it sounds like there's more proof than . . . there is. And so that's why I think that a mistrial is warranted in this case.

. . . .

A motion in limine is so you don't have to stand up and object. So you don't have -- the jury doesn't have to think that you're trying to hide evidence.

And that's exactly what we have here in this case now. After she blurts something out that was specifically excluded and ***the way it came out makes it sounds like she's only talking about [the defendant's] DNA. It makes it sound that there is evidence that [the jury is] not getting. And***

***that someone is hiding evidence. And that's the exact
reason why motions in limine are granted***.

And just to read [from *Fischman v. Suen*, 672 So. 2d 644,
645 (Fla. 4th DCA 1996)], "Being human, jurors typically want
to hear all the evidence pertaining to the case. By using a
motion in limine, a prudent lawyer can avoid giving the jury
the impression that he is concealing something crucial."

And again, we did that in this case. The Court granted it.
And not responsive to any question, she blurts out those
statements.

And I would also argue that by doing that, it was -- by that
statement, she knew that there was a motion in limine
because of the statement "You're trying" -- you know, "Now
you guys say there's not DNA." So ***she knew about the
motion in limine. She knew the Court's ruling. I would
say that that was an intentional statement that she
made and intentionally brought evidence that shouldn't
have been in front of this jury to the jury that they
weren't supposed to hear. Again, to think that it's
someone else's DNA just is illogical.***

(emphasis added).

The state responded that the alleged victim's statement did not rise to
the level of declaring a mistrial. The state argued, in pertinent part:

[The alleged victim] never specifically said that the DNA
was the defendant's DNA that was found on her buttocks. In
fact, I know defense . . . wants to say that it was intentional.

I would point out that [the alleged witness] is a lay person.
There was a DNA expert that testified. [The DNA expert]
testified that there was, in fact, a DNA profile that was found
on her butt and that it was inconclusive.

So we have a lay person who did make that statement. I'm
not saying that it was correct. She was in error for making
the statement, but what her understanding of it would be.

And I would submit to the Court that she doesn't have a
grasp.

14

## 4. *The Trial Court's Denial of the Motion for Mistrial*

Following the parties' arguments, the trial court announced it was denying the defendant's motion for mistrial. The trial court reasoned, in pertinent part:

> I'm relying on *Gosciminski v. State*, 132 So. 3d 678 [(Fla. 2013)], where it just really outlines what the court needs to do when considering a motion for mistrial. It does point out there that the power to declare a mistrial should be exercised with great care and caution and should be done only in the cases of absolute necessity.
>
> I find that the non-responsive statement of "Now you guys say DNA not on my butt. It was on my butt" was harmless as the statement did not say or attribute the DNA to the defendant. That testimony was -- actually came out through [the DNA experts] who indicated that DNA was actually present on her buttocks. They could not identify who it came to. There was at least three individuals.
>
> That case *Gosciminski v. State* also outlines that "A new trial is only merited when one, the comments must either deprive a defendant of a fair and impartial trial."
>
> I find that [the comments] don't do that because the comment was put into context by the expert testimony indicating that DNA found on her buttocks was inconclusive. It corroborates her statement when she says "DNA was on my butt."
>
> And two, another [consideration from *Gosciminski*] would be "whether or not it materially contributes to the conviction." We don't even know that there's a conviction. But I don't know how it would as the comment was explained by DNA analysis to say it's inconclusive. It does say it was there, but that it was inconclusive.
>
> I don't find it to be so harmful or fundamentally tainted as to require a new trial, meaning that statement, that it fundamentally tainted or requires a new trial.

15

And I don't find that it was so inflammatory that it might have influenced the jury to reach a more severe verdict as I believe the expert testimony on DNA would explain how that DNA got there.

So I find that the statement does not vitiate the entire process. And based on the case law, I will deny the motion for mistrial.

Okay. And also for the intentional aspect of it, I didn't find that that was intentional. For the record, I just want to point out how long she was on the stand. And at any other time, I did not find that she was trying to interject things or interpose her feelings into those. I believe that she said those things out of frustration. I don't find that it was intentional.

It's still a violation and she should not have done it; I'm not saying she should have done it. I just don't believe that the evidence would justify me finding that it was intentional.

During the state's closing, the state did not rely on the alleged victim's statements about the DNA on her buttocks, but instead argued, "And why wasn't the DNA on her butt? Because [the defendant] was moving [his penis] around. Just like casual touching with a push, it doesn't leave as much DNA."

The jury found the defendant guilty of attempted sexual battery (victim eighteen years of age or older) while in possession of a weapon, and simple battery for touching the alleged victim's breasts. The jury found the defendant not guilty of simple battery for touching the alleged victim's vagina.

The defendant moved for a new trial on several grounds. The primary ground was that the trial court erred in denying his motion for mistrial when the alleged victim intentionally violated the trial court's clarified order on the motion in limine by testifying about the DNA on her buttocks.

The trial court entered an order summarily denying the defendant's motion for new trial. This appeal followed.

16

### 5. *Our Review*

"A trial court's denial of a motion for mistrial is reviewed by an abuse of discretion standard. Discretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court." *Gosciminski v. State*, 132 So. 3d 678, 695 (Fla. 2013) (citations and internal quotation marks omitted).

In *Gosciminski,* the Florida Supreme Court set forth the standards for review of a motion for mistrial on the basis of improper witness testimony:

> The granting of a motion for mistrial is not based on whether the error is prejudicial. Rather, *the standard requires that a mistrial be granted only when an error is so prejudicial as to vitiate the entire trial, such that a mistrial is necessary to ensure that the defendant receives a fair trial.* It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity. Therefore, *in order . . . to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.*

*Id.* at 695-96 (emphasis added; internal quotation marks, citations, and brackets omitted).

Here, we conclude the defendant's motion for mistrial met the first three reasons in combination with each other, meriting a new trial. We address each in turn.

### a. **The alleged victim's comment deprived the defendant of a fair trial.**

Defense counsel took every effort necessary, by filing the motion in limine and motion for clarification, to exclude any testimony implying that the defendant's DNA was on the alleged victim's buttocks, because no statistical evidence existed to support such testimony. The defendant obtained two favorable orders on those motions, with the latter clarified order ultimately providing that any testimony regarding law enforcement's

efforts to identify the DNA found on the alleged victim's buttocks could only indicate that such efforts were "inconclusive."

Despite those successful efforts, the alleged victim commented about the DNA on her buttocks during her testimony, even though that subject was not responsive to defense counsel's question at that moment. That is, when defense counsel asked her why she did not initially give her name to law enforcement, she instead exclaimed, "You see the DNA results on me. And now you guys say the DNA's not on my butt, but it was on my butt. It was enough -- ."

No ambiguity or confusion existed that the alleged victim was referring to the defendant's DNA being on her buttocks. The trial court's first impression in the immediate aftermath of the comment was correct: ***"[S]he made it sound like it was his DNA."***

Only later in the day, after the trial court had the comment's audio recording replayed three times for itself and the attorneys, did the trial court change its impression to find that "the statement did not say or attribute the DNA to the defendant." The jury did not have the benefit of any replay, much less three replays. Instead, the jury likely was left with the same first impression which the trial court expressed earlier in the day: "[S]he made it sound like it was his DNA."

Given that impression, the alleged victim's comment deprived the defendant of a fair trial because, as explained in the next subsection, the comment reasonably may have materially contributed to the defendant's conviction.

b. **Based on the jury's verdict, we cannot say beyond a reasonable doubt that the alleged victim's comment did not materially contribute to the defendant's conviction.**

Because interviewing the jury is not an option, it is somewhat challenging to determine whether the alleged victim's comment materially contributed to the defendant's conviction.

However, we can consider the jury's verdict. More specifically, we can consider the jury's verdict in context, that is, by the chronological sequence in which the defendant allegedly committed the crimes during this incident.

On the first crime which the defendant allegedly committed, simple battery for touching the alleged victim's breasts, the jury convicted the defendant.

On the second crime which the defendant allegedly committed, simple battery for touching the alleged victim's vagina, the jury acquitted the defendant.

And on the third crime which the defendant allegedly committed, attempted sexual battery for his penis having union with her anus or vagina, the jury convicted the defendant.

This verdict begs a question. If the jury found the alleged victim's testimony credible from start to finish, why would the jury have convicted the defendant of only the first and third crimes which occurred, but acquitted him of the second crime which allegedly occurred in between?

We must acknowledge a reasonably possible answer – because no DNA sample from the alleged victim's vagina was taken or analyzed. Thus perhaps not providing the jurors with sufficient evidence for them to convict the defendant of the second crime beyond a reasonable doubt.

Which begs another question. The sheriff's office's forensic scientists' testimony regarding the alleged victim's buttocks was, to use the trial court's term, "inconclusive," in that (1) the autosomal DNA indicated the presence of *at least two individuals* on the lower area and *three individuals* on the upper area, and (2) the Y-STR DNA indicated the presence of *three males, with no conclusions made because the mixture was too complex.* Given that "inconclusive" testimony, why would the jury not have also acquitted the defendant of the attempted sexual battery charge, just as the jury acquitted the defendant of the simple battery charge for which DNA evidence was lacking?

We again must acknowledge a reasonably possible answer – the jury was influenced by the alleged victim's comment which "made it sound like it was __*his*__ DNA" on her buttocks.

Based on the foregoing reasoning, we cannot say beyond a reasonable doubt that the alleged victim's comment did not materially contribute to the defendant's conviction. *Cf. McClain v. State*, 516 So. 2d 53, 55 (Fla. 2d DCA 1987) ("There were no eyewitnesses to the alleged incident other than the alleged victim. The jury's verdict basically distilled down to whether they believed the [alleged victim's] version of the events that transpired, or appellant's version. Given the quantity and quality of the

evidence before the jury, we cannot say beyond a reasonable doubt that the [alleged victim's] statement did not affect the verdict.").

### c. **The alleged victim's comment was so harmful or fundamentally tainted as to require a new trial.**

For this discussion, we must focus on the alleged victim's state of mind and knowledge when she made the comment implying that the defendant's DNA was on her buttocks.

The trial court found that the alleged victim's comment was "not intentional." But the trial court's use of the words "not intentional" appears to have been a misnomer. The alleged victim exclaimed, "You see the DNA results on me. And now you guys say the DNA's not on my butt, but it was on my butt. It was enough -- ." In that moment, the alleged victim "intended" to make that statement.

Perhaps a more accurate description of what the trial court was trying to articulate about the alleged victim's state of mind was that the alleged victim simply blurted out her comment in a moment of frustration during a thorough and lengthy cross-examination, and had not planned in advance to interject her comment. As the transcript shows, the trial court had prefaced its finding by stating, "I did not find that she was trying to interject things or interpose her feelings into those. I believe that she said those things out of frustration."

While the trial court's prefatory observation may have been accurate, the trial court may have overlooked a more important point. Regardless of whether the alleged victim made the comment out of frustration, she *knew on the very morning of her cross-examination* that she was not allowed to testify the defendant's DNA was on her buttocks. As was discussed immediately after the defendant moved for a mistrial:

> THE COURT: . . . I don't think that it was done intentionally. I mean, did [the state] tell her she was not allowed to mention anything about DNA on her butt?
>
> [STATE]: *She knows that the DNA on her butt is not coming into evidence.*
>
> THE COURT: Okay. So then why would she say that, just out of curiosity?
>
> [STATE]: I don't know why she would say that.

20

A few minutes later, the state more fully explained how the alleged victim knew that she was "not allowed to get into DNA":

> THE COURT: Okay. I'm not really finding that right now that it was intentional. I don't -- unless you told her "We're not getting into DNA. You're not allowed to talk about DNA" --
>
> **[STATE]:** ***In a conversation that happened this morning, she emailed me and said "I know that there's no" -- I don't know how she knows this because I didn't -- maybe her and I did talk about it and I just don't remember. She said "I know we're not allowed to get into DNA." And I said "We're not talking about that in this trial*** and I can't talk to you because you're in the middle of your cross-examination."

Thus, not only did the alleged victim apparently know about the trial court's clarified order on the motion in limine, but the ruling was also fresh in the alleged victim's mind from earlier that morning.

The alleged victim's inability to hold back her comment, though perhaps emotionally understandable as the trial court found, nevertheless was a knowing violation of the trial court's unequivocal clarified order on the motion in limine. As explained above, that knowing violation reasonably may have materially contributed to the defendant's conviction.

### d. A curative instruction would not have remedied this violation.

The state argues that even if the jury could have drawn an improper inference from the alleged victim's comment, this violation may have been remedied by a curative instruction, which the trial court offered, but the defendant declined. By declining a curative instruction, the state argues, the defendant waived any error in denying the motion for mistrial.

We disagree. As the Florida Supreme Court stated in *Spencer v. State*, 645 So. 3d 377 (Fla. 1994):

> In some circumstances, defense counsel may determine that a curative instruction would place undue emphasis on the issue and thus could actually cause more harm than the original improper comment. Defense counsel may also conclude that a curative instruction would not cure the error and thus is not necessary. Thus, a defendant need not

request a curative instruction in order to preserve an improper comment issue for appeal. *The issue is preserved if the defendant makes a timely specific objection and moves for a mistrial.*

*Id.* at 383 (emphasis added); *see also Breedlove v. State*, 413 So. 2d 1, 7 (Fla. 1982) ("Improper remarks can be cured by ordering the jury to ignore them *unless they are so objectionable that such instruction would be unavailing.*") (emphasis added).

Here, we agree with the defendant that the trial court's offer of a curative instruction would have been unavailing in attempting to remedy this violation. The clear implication from the alleged victim's comment, that the defendant's DNA was on the alleged victim's buttocks, struck at the heart of the defense's claim that the defendant never touched any part of the alleged victim's buttocks.

In support of our conclusion, we rely on three other cases, *Fischman v. Suen*, 672 So. 2d 644 (Fla. 4th DCA 1996), *Orvis v. Caulkins Indiantown Citrus Co.*, 861 So. 2d 1181 (Fla. 4th DCA 2003), and *Howard v. State*, 950 So. 2d 1260 (Fla. 5th DCA 2007).

In *Fischman*, two doctors formerly working together in a medical practice sued each other for damages. 672 So. 2d at 645. Before trial, the senior doctor moved in limine to preclude the junior doctor from mentioning anything about Medicare fraud. *Id.* The trial court granted the motion. *Id.* At the jury trial, the junior doctor, explaining why he left the practice, listed several reasons and ended with the statement that he was "very uncomfortable because [*the senior doctor*] *told me basically to commit [M]edicare fraud.*" *Id.* (emphasis added). The senior doctor timely objected. *Id.* The trial court instructed the jury to disregard everything about Medicare fraud and denied the senior doctor's motion for mistrial, though acknowledging that the issue was close. *Id.* The jury returned a verdict in the junior doctor's favor. *Id.* The senior doctor appealed. *Id.*

We reversed. In reaching our decision, we observed that a motion in limine is especially appropriate when "addressed to evidence which will be highly prejudicial to the moving party and which . . . would be unlikely to be disregarded by the jury despite an instruction by the court to do so." *Id.* at 645 (citation omitted). We further observed:

Obtaining a pretrial order conserves the jury's time and serves as a firm warning to a party not to take the first step toward mistrial or reversal. A practical advantage of a motion in

22

limine is not having to object in the jury's presence to evidence which is logically relevant but legally inadmissible. Being human, jurors typically want to hear *all* the evidence pertaining to a case. By using a motion in limine, a prudent lawyer can avoid giving the jury the impression that he [or she] is concealing something crucial.

. . . .

[Other] types of in limine violations are less flagrant than [the junior doctor's here], which involves an accusation of criminal conduct difficult for a jury to ignore. While a curative instruction might alleviate a more benign evidentiary gaffe, the instruction in this case may have amplified the prejudice to [the senior doctor]. This was a close case. The credibility of the two doctors was central to the . . . issues presented to the jury. [The junior doctor's] violation of the pretrial order was egregious enough to entitle [the senior doctor] to a new trial.

*Id.* at 645-46 (internal citation omitted).

In *Orvis*, we held that a trial court abused its discretion in failing to grant a motion for a new trial, where defense counsel acknowledged his cross-examination question to the plaintiff violated an order in limine precluding any questions regarding the plaintiff's alleged illegal contact with third parties. 861 So. 2d at 1184. We reasoned:

Like *Fischman*, the improper question in this case involved "an accusation of criminal conduct difficult for a jury to ignore." Moreover, also like *Fischman*, the curative instruction given by the judge here may have amplified the prejudice to [the plaintiff]. . . . Finally, where in *Fischman* the credibility of the two doctors was central to the issues presented to the jury, in this case, the credibility of [the plaintiff] was critical to the issue sent to the jury.

*Id.* (emphasis in original).

In *Howard*, the Fifth District held that a trial court's curative instruction was inadequate, and the trial court instead should have granted a criminal defendant's motion for mistrial on a battery charge, where the alleged victim testified that he had raped her in the past, thereby violating an agreed order in limine regarding the defendant's "other crimes

23

or bad acts." 950 So. 2d at 1262. Our sister court reasoned: "Given the quantity and quality of evidence before the jury, and in light of the other evidence improperly presented over defense objection, we cannot say beyond a reasonable doubt that the victim's statement that [the defendant] had raped her in the past did not affect the verdict." *Id.* at 1264.

Like the foregoing cases, this was a close case as well. The credibility of the alleged victim and the defendant was central to the issues presented to the jury. The alleged victim's statement to defense counsel, "You see the DNA results on me. And now you guys say the DNA's not on my butt, but it was on my butt. It was enough -- ," was extremely significant. If the jury understood and believed the alleged victim's statement to mean that proof existed of the defendant's DNA on her buttocks, then such statement gutted the defendant's claim that he did not touch the alleged victim's buttocks in any manner. In turn, the credibility of the defendant's testimony regarding the entire incident was subject to question, if not being wholly rejected. Thus, the alleged victim's knowing violation of the pretrial order regarding the DNA on her buttocks was egregious enough to entitle the defendant to a new trial. A curative instruction would not have alleviated this knowing violation.

### e. *Guzman v. State* is distinguishable.

One other case, *Guzman v. State*, 214 So. 3d 625 (Fla. 2017), which neither party to this case cited, deserves mention. In *Guzman*, the Florida Supreme Court affirmed a trial court's denial of a motion for mistrial based on the alleged improper discussion of DNA evidence. However, *Guzman* is distinguishable.

In *Guzman*, a woman was murdered in her apartment, and DNA analysis of several items in the apartment revealed a single male DNA profile. *Id.* at 628-29. Four years later, a cold case detective received a hit from the FBI's combined DNA index system ("CODIS") indicating that Guzman's DNA profile matched the male DNA profile found at the woman's apartment. *Id.* at 629. Guzman was indicted for the murder. *Id.* at 628.

When the detective was testifying at Guzman's trial, the detective initially did not mention CODIS during his testimony. *Id.* at 629 n.1. Instead, the detective merely testified that he learned of "information" leading him to suspect Guzman was responsible for the woman's murder. *Id.* at 629. The detective testified that after Guzman became a suspect, a DNA profile was obtained from him, and the crime lab confirmed that his DNA profile matched the male DNA profile found at the woman's apartment. *Id.*

However, at some point later during the detective's testimony, while discussing the steps he took in his investigation, he stated, "the next thing that occurred is . . . I was told that there was a possible DNA match." *Id.* at 632.

Guzman's counsel, apparently believing that the detective's testimony about "a possible DNA match" was referring to the hit from CODIS, moved to strike the statement and moved for a mistrial. *Id.*

The trial court granted Guzman's motion to strike but denied his motion for mistrial. The trial court instructed the jury to "disregard the last statement by [the detective]." *Id.*

On appeal, Guzman argued that the trial court erred in denying his motion for mistrial, because the detective's reference to "a possible DNA match" "had the unmistakable effect of telling the jury that . . . Guzman's DNA was already in a database of criminal offenders." *Id.* at 633.

The Florida Supreme Court disagreed, reasoning:

> [T]here was no evidence introduced at the guilt phase that Guzman was charged with or convicted of any prior crimes, nor was there any evidence that his DNA was in a database of criminal offenders. Further, the comment was brief, isolated, inadvertent, and the jury was instructed to disregard it.
>
> . . . .
>
> At the point in Guzman's trial when [the detective] mentioned "a possible DNA match," the jury had already learned from earlier witnesses that Guzman's DNA matched the male DNA found . . . at the crime scene, and that DNA analysis was conducted more than once in this case. . . . [The detective's] testimony did not implicate Guzman in prior criminal activity but would "most reasonably be interpreted in context as referring to the facts of the crime that was being investigated." Thus, the trial court did not abuse its discretion in denying the motion for mistrial.

*Id.* at 633-34.

*Guzman* is distinguishable from the instant case in three respects.

25

First, the Supreme Court did not mention whether Guzman had filed a pre-trial motion in limine to exclude any mention of the fact that his DNA was found in CODIS. Here, however, the defendant not only filed a pre-trial motion in limine, but also obtained two favorable orders on that motion, with the latter order ultimately providing that any testimony regarding law enforcement's efforts to identify the DNA found on the alleged victim's buttocks could only indicate that such efforts were "inconclusive."

Second, the Supreme Court concluded that the detective's comment in *Guzman* was "inadvertent." *Id.* at 633. Here, however, the alleged victim's comment cannot be described as merely "inadvertent." As the state admitted to the trial court, on the very morning of defense counsel's cross-examination, the alleged victim e-mailed the state, "I know we're not allowed to get into DNA," to which the state responded, "We're not talking about that in this trial." And yet just hours later, the alleged victim implied that the defendant's DNA was on her buttocks, even when that subject was not responsive to defense counsel's question at that moment.

Third, the Supreme Court disagreed with Guzman's argument that the detective's statement "had the unmistakable effect of telling the jury that . . . Guzman's DNA was already in a database of criminal offenders." *Id.* Instead, the Supreme Court concluded that Guzman's jury reasonably would interpret the detective's statement as referring to the crime being investigated, and not to any prior crimes. *Id.* at 633-34. Here, however, the jury reasonably may not have interpreted the alleged victim's comment as referring to another person's DNA. As the trial court, in a similar position to interpret the comment as the jury heard it, immediately remarked: ***"[S]he made it sound like it was his DNA."***

For these three reasons, we conclude that *Guzman* is distinguishable from the instant case.

### ***Conclusion***

In sum, we are compelled to reverse the trial court's denial of the defendant's motion for mistrial based on four compelling factors: the defendant obtained favorable rulings on his pre-trial motion in limine and motion for clarification to exclude what would be unfairly prejudicial evidence; the alleged victim knowingly violated the trial court's order; based on the nature of the jury's verdict, we cannot say beyond a reasonable doubt that the violation did not materially contribute to the defendant's conviction; and a curative instruction would not have remedied the defendant's right to a fair trial under these circumstances.

To rule otherwise would be unreasonable, and that is why we believe the abuse of discretion standard has been met in this case, and why we must reverse the trial court's decision.

By our decision, we do not mean to suggest that every violation of an order granting a motion in limine should result in a mistrial. *See Leyva v. Samess*, 732 So. 2d 1118, 1121 (Fla. 4th DCA 1999) ("Not every violation of a pretrial order in limine should automatically result in a new trial.").

What mandates our decision here is the combination of the four compelling factors which we have described above. This combination has caused an error "so prejudicial as to vitiate the entire trial, such that a mistrial is necessary *to ensure that the defendant receives a fair trial.*" *Gosciminski*, 132 So. 3d at 696 (emphasis added; internal citations and quotation marks omitted).

Based on the foregoing, we reverse the defendant's attempted sexual battery and simple battery convictions and sentences, and remand for a new trial on those two charges. Without further discussion, the other arguments which the defendant has raised in this appeal lack merit.

*Reversed and remanded for new trial.*

DAMOORGIAN and CIKLIN, JJ., concur.

*         *         *

**No further motions for rehearing shall be considered.**